UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOSE RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | 11 C 5514 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| DR. PARTHASARATHI GHOSH, LATANYA WILLIAMS, and WEXFORD HEALTH SOURCES, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this *pro se* suit under 42 U.S.C. § 1983, Jose Rodriguez, an inmate in the Illinois Department of Corrections ("IDOC"), alleges deliberate indifference to his severe knee injury in violation of the Eighth Amendment. The court dismissed Rodriguez's claims against two IDOC administrative officials and a physician at the University of Illinois Medical Center ("UIC"). Docs. 5, 59. The remaining defendants—Dr. Parthasarathi Ghosh, a doctor; LaTanya Williams, a physician's assistant; and Wexford Health Sources, the private company that employs them—have moved for summary judgment. Doc. 84. The court on several occasions postponed consideration of the motion to allow Rodriguez the time and opportunity to obtain in discovery and from his fellow inmates the materials that he maintained were necessary to effectively oppose summary judgment. Docs. 94, 102, 108, 114, 120-121, 129, 132. The court set a deadline of January 5, 2015, for Rodriguez to file his last supplemental brief; that date came and went without Rodriguez filing anything. Having considered all of the materials submitted by the parties, the court grants summary judgment to Williams and Wexford and denies it to Dr. Ghosh.

1

**Background**

The facts are set forth as favorably to Rodriguez, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of these facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012).

Rodriguez is a prisoner who at all relevant times was housed at Stateville Correctional Center. Doc. 92 at ¶¶ 7-9. Dr. Ghosh is a physician who at all relevant times was the Medical Director at Stateville. Doc. 71 at ¶ 8. Williams was a physician's assistant at Stateville. *Id*. at ¶ 9. Wexford provides medical services for IDOC and at all relevant times employed Ghosh and Williams. *Id*. at ¶ 11.

Rodriguez developed knee pain in or around 2005, when he first entered Stateville. Doc. 92 at ¶¶ 8-9. Stateville physicians examined him and referred him to UIC for treatment. *Id*. at ¶¶ 10-11. Rodriguez had at least four return visits to UIC, during which he underwent a series of tests, including x-rays and MRIs. *Id*. at ¶ 20-22. The first MRI, performed on September 27, 2005, indicated a subacute distal LCL (lateral collateral ligament) sprain, subtle bone edema (suggesting injury to the tibiofibular articulation), and early mucinous degeneration. Doc. 85-2 at 57. A second MRI approximately six weeks later indicated improvement to the tibiofibular articulation and the distal LCL sprain, but uncovered a small join effusion and an incomplete radial tear of the medial meniscus. *Id*. at 55. Rodriguez underwent another MRI several years later, in October 2011. *Id*. at 52. A comparison of the 2005 MRIs to the 2011 MRI indicated that Rodriguez suffered from a chronic LCL sprain, a slight worsening of the degeneration of the medial meniscus, and trace knee joint effusion. *Id*. at 52-53.

In the meantime, based on a physical exam performed on October 20, 2005, a UIC physician, Dr. Chow, recommended that Rodriguez wear a knee brace with patellar cut-out and a medial "J-pad" to prevent patellar subluxation. *Id*. at 47. At a follow-up visit to UIC on December 8, 2005, another physician, Dr. Hutchinson noted that the knee sleeve issued to Rodriguez lacked the recommended lateral J-pad and did not laterally control the knee. *Id*. at 44. Dr. Hutchinson suggested that a sleeve with a lateral J-pad or a "Shield's" hinged knee brace would provide better patella control and relieve Rodriguez's pain, and accordingly recommended that Rodriguez be given either type of knee brace as well as physical therapy. *Id*. at 44-45.

Rodriguez's next UIC appointment was on July 25, 2006. *Id*. at 42. Rodriguez reported that despite UIC's specific request, he had not received physical therapy at Stateville. *Ibid*. Dr. Blint noted that Rodriguez's ACL appeared intact on the MRI, but that "clinically he [did] have an ACL rupture." *Ibid*. Rodriguez's left knee showed a 2+ "Lachman" score, which indicates ACL injury. *Ibid*. Dr. Blint ordered physical therapy. *Ibid*.

By November 7, 2006, Rodriguez's left knee showed a 3+ Lachman score, *id*. at 40, which is more severe than a 2+ score, *see* www.orthopaedicsone.com/display/Main/Lachman+test+of+the+knee. *Id*. at 40. Another UIC physician, Dr. McFadden, planned for Rodriguez to wear a Shield's hinged brace and again recommended physical therapy. *Id*. at 41. The doctor advised Rodriguez that he would benefit from posterolateral corner reconstruction surgery. *Ibid*. However, because Dr. McFadden was under the impression that physical therapy was not available at Stateville, he believed that surgery would leave Rodriguez with arthrofibrosis of the knee and therefore was "contraindicated." *Ibid*. Dr. Chmell was the attending physician supervising Dr. McFadden at the time. *Id*. at 40.

When Rodriguez saw Dr. Chmell at UIC on March 13, 2007, his knee was "grossly unstable." *Id*. at 38. Rodriguez continued to show a positive Lachman score, posterolateral corner injury, and ACL deficiency. *Ibid*. Dr. Chmell noted that Rodriguez was wearing "just a neoprene knee sleeve," even though a Shield's brace had been ordered at his last appointment. *Ibid*. Again, Dr. Chmell recommended physical therapy as well as a hinged knee brace with rigid stays over the knee. *Id*. at 38-39.

On September 18, 2007, Dr. Chmell spoke with Dr. Ghosh about Rodriguez's treatment. *Id*. at 37. Dr. Ghosh explained that Rodriguez could not receive the recommended knee brace with rigid stays because, in the past, inmates had used that type of brace as a weapon. *Ibid*.

Rodriguez received physical therapy at Stateville in 2007 and 2008. Doc. 92 at ¶ 23; Doc. 85-2 at 43:13-21. He did not return to UIC until April 25, 2011, when he reported that his knee sleeve was providing no relief. Doc. 85-2 at 35. Dr. Chmell observed "gross instability" when Rodriguez put weight on his left leg, noting that his left knee moved laterally and medially with weight bearing. *Ibid*. Dr. Chmell further noted elevated laxity and Lachman score, as well as a "posterior drawer." *Ibid*.

Rodriguez has received fabric braces to support his knee, but they have been ineffective at stabilizing its lateral movement. Doc. 92 at ¶ 13, Doc. 85-2 at 30:11-32:20. Rodriguez filed a grievance in 2010, alleging that the elastic knee sleeve was inadequate and that Dr. Ghosh and Ms. Williams were responsible. Doc. 125 at 2, 18. In denying the grievance, the grievance officer noted that a hinged knee brace had been ordered, but that the assistant warden denied the order because the brace contained metal strips; the officer further noted that Dr. Ghosh had prescribed pain medication and given Rodriguez a low bunk/low gallery permit and a knee brace permit. *Id*. at 18.

Rodriguez filed an emergency grievance on March 4, 2011, alleging an improper delay in processing the 2010 grievance and seeking a hinged knee brace. *Id*. at 15. On June 8, 2011, the Administrative Review Board recommended that Rodriguez's complaint be remanded for review by the medical director and the warden. *Ibid*. A July 27, 2011 email exchange between IDOC doctors included these comments about Rodriguez: "This patient has a posterior and laterally unstable knee where UIC recommended a metal hinged knee brace, and specifically mentioned anything short of that would not be of any use, the alternative would be surgery. There is a note on 11/4/10 that indicates that a metal hinged brace was ordered, but the warden wouldn't allow its use in the cellhouse. There is no note by Dr. Ghosh in response to this. The question is if he needs to be kept in the infirmary long term for use of this metal hinged brace." *Id*. at 10.

Rodriguez has a low bunk/low gallery permit due to his knee injury, and is housed in a low gallery and sleeps in a low bunk. Doc. 92 at ¶¶ 24-25. In challenging Defendants' contention that IDOC does not permit knee braces with metal strips due to security concerns, Rodriguez points to the affidavit of another prisoner, Robert Dalton, averring that he had received a knee immobilizer and a knee brace for his knee injury. *Id*. at ¶ 16; Doc. 99 at 13. Although the affidavit does not reveal whether the immobilizer contains metal, Dr. Ghosh and Williams both admitted to treating inmates in the infirmary who wore knee braces with metal parts. Doc. 99 at 17-18.

## Discussion

To prevail on his Eighth Amendment claim, Rodriguez must show that Defendants were not merely negligent, but "display[ed] deliberate indifference to a serious medical need." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010); *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Deliberate indifference has an objective element, that Rodriguez's

medical condition be "objectively serious," and a subjective component, that Defendants "acted with a sufficiently culpable state of mind" in that they had "subjective knowledge of the risk to the inmate's health and … disregard[ed] that risk." *Thomas*, 604 F.3d at 301 (internal quotation marks omitted). The fact that a prisoner has received some medical treatment does not necessarily defeat his claim, because deliberate indifference to a serious medical need can be manifested by blatantly inappropriate treatment that would seriously aggravate the prisoner's condition, *see Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005), or by "woefully inadequate" action or no action at all, *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999). The subjective component encompasses conduct such as refusing to treat a prisoner's chronic pain, *see Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999), or erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards, *see Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). Neither medical malpractice nor a mere disagreement with a doctor's medical judgment, however, amounts to deliberate indifference. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). The court examines the totality of the medical care provided; isolated incidents of delay do not rise to the level of deliberate indifference. *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000); *Gutierrez v. Peters*, 111 F.3d 1364, 1374-75 (7th Cir. 1997).

"An objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (internal quotation marks omitted). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Ibid*.; *see Reed*, 178 F.3d 852-53 (same). Defendants

understandably and correctly do not deny that Rodriguez's medical condition is "serious." Doc. 84-1 at 2-6. Rodriguez was diagnosed with a variety of knee ailments and suffers from chronic knee pain. His condition has deteriorated to the point of "gross instability" and visible knee movement with weight bearing. UIC doctors repeatedly recommended a specific type of stabilizing knee brace and physical therapy; they discussed the probable helpfulness of surgery, but decided against it due to their belief that post-surgical physical therapy was unavailable at Stateville. Rodriguez received elastic knee braces, pain medication, and accommodations in the prison. His chronic knee pain and worsening instability were diagnosed as mandating treatment. Given all this, his knee issues qualify as objectively serious medical condition. *See Gaston v. Ghosh*, 498 F. App'x 629, 632 (7th Cir. 2012) (recognizing that a meniscus injury can be an objectively serious medical condition); *Roe*, 631 F.3d at 861-62 & n.15 ("our cases demonstrate that a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, … [such as] "*O'Malley v. Litscher*, 465 F.3d 799, 805 (7th Cir. 2006) (per curiam) (minor burns resulting from lying in vomit); *Norfleet v. Webster*, 439 F.3d 392, 394-95 (7th Cir. 2006) (arthritis); *Johnson v. Doughty*, 433 F.3d 1001, 1003-04, 1010 (7th Cir. 2006) (hernia); *Greeno v. Daley*, 414 F.3d 645, 649-51 (7th Cir. 2005) (heartburn and vomiting); *Duncan v. Duckworth*, 644 F.2d 653, 654 (7th Cir. 1981) (fractured wrist)").

Rodriguez's claim centers on the denial of the specific type of knee brace with rigid metal stays recommended by the UIC doctors or, in the alternative, surgery followed by physical therapy. Defendants maintain that they were hamstrung by an IDOC policy prohibiting Stateville inmates from wearing braces containing metal pieces, at least when they are not housed in the infirmary. Doc. 84-1 at 3; Doc. 100-1 at 2-4. Indeed, documents attached to the complaint itself indicate that Stateville administrative officials, not Dr. Ghosh, Williams, or

Wexford, blocked Rodriguez's access to the recommended metal-hinged knee brace. Doc. 6 at 14, 16, 21; *see also* Doc. 85-2 at 37; Doc. 125 at ¶ 4. But Defendants can be held liable for failing to treat Rodriguez in a manner that was not prohibited by prison policy—specifically, by providing Rodriguez with surgery followed by physical therapy, or by giving Rodriguez a metal-hinged knee brace and housing him in the infirmary. The UIC specialists repeatedly stated that a Shield's brace with stiff metal stays would provide the necessary stability for Rodriguez's knee. And the July 2011 email indicates that Stateville doctors knew that "anything short of [a metal-hinged knee brace] would not be of any use," that "the alternative would be surgery," and that "the question is if he needs to be kept in the infirmary long term for use of this metal hinged brace." Doc. 125 at 10. Dr. Ghosh admitted that he knew of inmates in the infirmary wearing knee braces with metal parts. Doc. 99 at 17.

True enough, differences of opinion among medical professionals over questions of treatment do not give rise to an Eighth Amendment claim. *See Estelle*, 429 U.S. at 107; *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But Rodriguez's claim does not arise from a mere difference of opinion. Doc. 100-1 at 4. His claim arises from Dr. Ghosh's failure to follow the UIC specialists' prescribed course of treatment, with which (a reasonable jury could find) he did not disagree, and his persistence in following a treatment plan that (a reasonable jury also could find) he knew was ineffective. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("Allegations of refusal to provide an inmate with prescribed medication or to follow the advice of a specialist can also state an Eighth Amendment claim."). Accordingly, on the summary judgment record, a reasonable jury could find that Dr. Ghosh was deliberately indifferent to Rodriguez's serious medical condition. *See id.* at 754 ("A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's

condition."); *Berry*, 604 F.3d at 441 ("[A] doctor's choice of the easier and less efficacious treatment for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment."); *Greeno*, 414 F.3d at 655 (noting that persisting in a course of treatment known to be ineffective can violate the Eighth Amendment); *Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004) ("Although Reed has an alternate explanation for the course of action he took, Gil has presented sufficient facts to create a genuine issue as to Reed's state of mind in refusing to follow the specialist's advice.").

That said, Rodriguez does not explain how Williams, the physician's assistant, was involved in his care or in the decisionmaking behind his treatment. Williams apparently ordered but did not distribute Rodriguez's medication, Doc. 92 at ¶¶ 26-27, and Rodriguez does not adduce evidence showing that it was within her power or duty to replace the ineffective knee sleeve with the prescribed brace with rigid stays. Without evidence that Williams personally "caused or participated in a constitutional deprivation," Rodriguez cannot proceed against Williams. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005); *see J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) ("[I]n order to recover damages against a state actor under § 1983, a plaintiff must show the actor was personally responsible for the constitutional deprivation.") (internal quotation marks omitted); *Duncan v. Duckworth*, 644 F.2d 653, 655 (7th Cir. 1981) (same).

As for Wexford itself, it cannot be held vicariously liable under § 1983 for Dr. Ghosh's conduct. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Instead, Rodriguez must show that Wexford had a "policy or custom … [that] inflict[ed] the injury …

[and was] the moving force of the constitutional violation" he suffered. *Id*. at 694. Wexford is a private corporation, but it is considered "a municipality" for purposes of § 1983 liability, as its medical services at Stateville are provided under color of state law. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014) ("In a number of decisions since *Monell*, our court has applied the *Monell* standard to private corporations."); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) ("Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices."); *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n. 6 (7th Cir. 2002) ("For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity."). Rodriguez does not point to any evidence indicating that Wexford has a policy or custom of noncompliance with specialists' diagnoses or prescribed courses of treatment. Wexford accordingly is entitled to judgment.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is granted with respect to the claims against Williams and Wexford and denied with respect the claim against Dr. Ghosh. Rodriguez's deliberate indifference claim against Dr. Ghosh shall proceed to trial.

April 9, 2015

United States District Judge